IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WISEMAN-HUGHES ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | No. 07 C 0336 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| HARLEYSVILLE LAKE STATES INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Wiseman-Hughes Enterprises, Inc. brought a four count complaint against its insurer, defendant Harleysville Lake States Insurance Company, alleging that defendant: breached the insurance contract (Count I); breached the common-law duty of good faith and fair dealing implied in all contracts (Count II); and vexatiously and unreasonably refused coverage in violation of 215 ILCS § 5/155 (Count III). Count IV seeks a declaration that defendant is estopped from denying liability because defendant never filed a declaratory judgment action seeking a declaration that its denial of coverage and refusal to defend was appropriate. Defendant subsequently filed a counterclaim (titled "counter-complaint"), seeking a declaration it owed no duty to defend plaintiff (Count I) and no duty to indemnify the plaintiff (Count II).

Plaintiff has moved for summary judgment on its complaint, and defendant has moved for summary judgment on the counterclaims. For the reasons explained below, the court denies both motions for summary judgment.

**STATEMENT OF FACTS**

Plaintiff, an Illinois corporation, is a home-builder in the Chicago area. Defendant, a Michigan corporation, is an insurance provider. From June 1, 2005, to June 1, 2006, plaintiff contracted with defendant for commercial general liability ("CGL") coverage. The coverage section of the policy provides in pertinent part:

**SECTION 1 - COVERAGES**

**COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against and "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. ...

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period. ...

2. **Exclusions**

   This insurance does not apply to:

   \* \* \*

   j. **Damage to Property**

      "Property damage" to

      (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

2

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products - completed operations hazard."
>
> **k.      Damage to Your Product**
>
> "Property damage" to "your product" arising out of it or any part of it.
>
> This insurance does not apply to:
>
> **Fungi or Bacteria**
>
> > a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.
> >
> > b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person.
> >
> > This exclusion does not apply to any "fungi" or bacteria that are, are on, or contained in, a good or product intended for consumption.

Between 2001 and 2005, plaintiff developed and constructed a residential subdivision in Sugar Grove, Illinois, called Windsor Pointe. To market the development, plaintiff built three model homes in 2001 and a fourth in 2004. In the late summer and early fall of 2005, four families purchased and moved into these homes – the Krugers, Grays, Croys, and McKays. On October 10, 2005, one of the homeowners contacted plaintiff complaining of medical problems that began after moving into the model home. The other model homeowners reported similar ailments. In addition, a mold test performed for a homeowner had resulted in a positive reading for mold and fungi.

Plaintiff wasted no time in evaluating the homeowners' concerns. It contacted an environmental firm that same day and requested an inspection of the home, which was completed two days later, on October 12, 2005. Plaintiff filed a loss notice through its agent under the commercial general liability policy with defendant eight days later on October 20, 2005. On that same day plaintiff moved the Kruger, Croy, and Gray homeowners to hotels while it prepared to test the model homes for fungi and bacteria contamination.

In a letter dated October 24, 2005, defendant acknowledged receipt of the notice of claim and stated that it would begin investigating the matter under a reservation of rights. Defendant also pointed out the problems with potential coverage of the claims because of the mold and bacteria exclusions in the policy. Defendant also retained a claims adjuster to evaluate the damage claims of the homeowners on October 24, 2005. On October 28, the adjuster participated in a meeting to exchange information and discuss potential options with plaintiff's environmental expert, the homeowners, and plaintiff.

On November 2, the environmental firm hired by plaintiff issued a written report recommending remediation of the homes. Plaintiff's environmental expert did not include results of water testing in these initial reports. Rather, the expert based the recommendation for remediation on surface and air test results that represented a low level of fungi and mold in the homes. On November 8, 2005, plaintiff, the homeowners, and the adjuster met with plaintiff's expert to discuss report and remediation. At this meeting, the possibility of bacterial contamination was brought to the attention of the adjuster. In early November, the homeowners threatened to pursue litigation against plaintiff. By November 10, 2005, plaintiff had retained counsel. Plaintiff requested a coverage decision from defendant on November 21. On November 22, plaintiff informed each of the families of its environmental firm's

4

recommendation to remediate the homes. Plaintiff began remediation on all the homes by December 5, 2005.

On December 9, 2005, defendant notified plaintiff that it had retained its own environmental testing firm to conduct and review previous testing on the homes. In this letter defendant also notified plaintiff that the policy exclusions for mold and bacteria-related losses applied to these claims and that the claim would likely not be covered. On December 13, 2005, one of the homeowners, Mr. Kruger, hired his own environmental testing firm.

The experts hired by Mr. Kruger, plaintiff, and defendant tested the homes several times between October 2005 and March 2006. Defendant's expert reviewed the tests performed by plaintiff's expert and determined that the illnesses could not have been caused by mold or bacteria. On December 31, 2005, the Krugers' expert issued a report finding a high level of bacteria in the potable water piping system that serviced all the model homes.

By letter dated January 16, 2006, defendant denied coverage under the bacteria/fungi exclusion "for any cost or expenses arising out of the testing for, treatment, clean up, or remediation for fungi or bacteria [as stated in the policy]." Defendant's denial of coverage relied on its expert's conclusion that "there was no mold, fungi or bacteria measured or observed in the homes," as well as the bacteria/fungi exclusion in the policy.

By letter dated February 22, 2006, plaintiff's attorney asked defendant to reconsider its denial of coverage in light of the exception to the fungi or bacteria exclusion, which excepted fungi or bacteria "found in products intended for consumption" from the fungi and bacteria exclusion. The letter also requested that defendant participate in settlement discussions planned with the homeowners. An internal memo by defendant dated February 27 claims there are a

number of coverage issues, but there still could be limited coverage and investigation would be needed to clarify whether the exclusion for fungus or bacteria applies.

Plaintiff settled with the Croy family on February 27, 2006. On February 28, plaintiff again contacted defendant requesting a coverage decision. Around April 14, plaintiff again contacted defendant seeking a coverage decision. The remaining homeowners and plaintiff agreed to mediate their claims outside of court. Plaintiff notified defendant of the mediations on April 19, 2006, but received no response. Another request for a coverage decision was made on May 4. On May 11, 2006, plaintiff settled with the McKay family.

On May 19, 2006, plaintiff participated in a mediation with the Krugers and Grays, settling both claims. Again, on June 6, 2006, plaintiff requested a coverage decision from defendant. Finally, in August of 2006, defendant issued a final decision not to reimburse plaintiff for any of its costs associated with any aspect of their claim. Plaintiff then filed the instant lawsuit to determine coverage under the policy and declare that defendant owed plaintiff duties of indemnification and defense under the policy.

## DISCUSSION

### Standard for Summary Judgment

Both parties have filed cross-motions for summary judgment under Fed. R. Civ. P. 56. A court should grant a motion for summary judgment if "there is no genuine issue of material fact and … the moving party is entitled to judgment as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment

motion, the court must read the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

Plaintiff seeks a declaration that the commercial general liability policy required defendant to provide coverage. Coverage under a CGL policy includes both the duty to defend and the duty to indemnify.

**The Duty to Defend**

Defendant's counterclaim sought a declaration that it bore no duty to defend plaintiff against the claims of the home-owners. Defendant argues that the duty to defend arises only in cases involving a formal complaint to a court of law.

The insurance contract states, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

"Suit" is defined as:

> A civil proceeding in which damages because of "bodily injury," "property damage," or "personal and advertising injury" to which this insurance applies are alleged.
>
> "Suit" includes: (a) an arbitration proceeding in which said damages are claimed and to which the insured must submit or does submit with our consent; or (b) any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Defendant argues that it owes no duty to defend the plaintiff because the language of the policy limits the duty to defend to "suits". Defendant relies on Lapham-Hickey Steel Corp. v.

7

Protection Mutual Ins. Co., 166 Ill.2d 520, 529 (1995), which defines a "suit" as being limited to a proceeding in a court of law, therefore requiring a formal complaint. In Lapham-Hickey, the policy limited the duty to defend to suits but did not define the term specifically. In the instant case, "suit" is clearly defined to include both a civil proceeding in which damages are alleged, or alternative dispute resolution (such as mediation) "with [defendant's] consent." Plaintiff claims that defendant's silence in response to plaintiff's repeated requests to participate or advise regarding the mediations should be construed as consent. Defendant counters that it had no duty to defend because, in its view as expressed in its January 16, 2006, letter, the damages were caused by defects not covered by the policy and, in any event, the fungi/bacteria exclusion precludes coverage. Whether defendant's silence constituted consent to the mediation is a question for the trier of fact.

**Coverage**

This rather circular reasoning directs the court to consider defendant's denial of coverage, as first articulated in its January 16, 2006, letter to plaintiff. The record demonstrates that a question of fact remains as to whether the illnesses were caused by fungi or bacteria and, if so, the source of the alleged infestation. These issues are material because the fungi/bacteria exclusion "does not apply to any 'fungi' or bacteria that are on, or contained in, a good or product intended for consumption." Plaintiff contends that the fungi and bacteria that caused its customers' illnesses and triggered the damages and expenses for which plaintiff seeks reimbursement were caused by the contamination of the municipal treated water that was left standing in the pipes of the model homes. As plaintiff points out (and pointed out repeatedly to defendant), drinking water supplied to residences is, without question, a "product intended for consumption." Defendant's expert, on the other hand, using the same test samples as plaintiff,

8

concluded there was no significant mold or bacterial contamination in the homes. Given the conflicting experts' reports, the trier of fact must determine what caused the illnesses.

Consequently, the claims raised by plaintiff in its complaint and defendant in its counterclaim rest on whether the denial of coverage was proper. Defendant's long delays in responding to plaintiff's request to defend it in the mediations and to issue its coverage decision would be improper if there was coverage under the policy. Contrary to defendant's argument, it was not only kept informed as to every decision and action plaintiff made regarding this incident, but plaintiff also frequently sought defendant's opinion regarding those decisions and actions.

Thus, one issue the court can decide on summary judgment is defendant's argument that plaintiff "voluntarily" paid remediation costs, investigation costs, and settlement damages to the home owners. As plaintiff has consistently pointed out throughout this controversy, and as established by the record, plaintiff was obligated to mitigate its damages, minimize its litigation and reputational exposure, and pay compensation to the innocent homeowners who suffered illnesses and property damage. Every day that passed, plaintiff's exposure to damages grew while defendant delayed a final decision. The duty to mitigate damages falls within the realm of good faith and fair dealing, which is a general contractual duty that is read into every contract, including insurance contracts. <u>Moran Foods, Inc. v. Mid-Atlantic Mkt. Dev. Co.</u>, 476 F.3d 436, 440 (7th Cir.2007). This duty obligates a potential defendant to limit its exposure to losses in a reasonable manner. Faced with the threat of litigation and an unresponsive insurer, plaintiff acted to the best of its ability to minimize its exposure and protect potential losses. There was nothing "voluntary" about plaintiff's payments and expenditures in this case.

9

## CONCLUSION

For the reasons stated above, the court denies plaintiff's and defendant's motions for summary judgment. This matter is set for a report on status April 16, 2009, at 9:00 a.m.

ENTER:    April 8, 2009

_____
**Robert W. Gettleman**
**United States District Judge**